Jacqui STARR, Plaintiff–Appellant,

v.

PEARLE VISION, INC., doing business as Pearle Vision Express, Defendant–Appellee.

No. 93–5118.

United States Court of Appeals, Tenth Circuit.

May 12, 1995.

Thomas L. Bright, Tulsa, OK, for plaintiff-appellant.

Michael Clark Redman of Doerner, Stuart, Saunders, Daniel & Anderson, Tulsa, OK (Kathy R. Neal and Diana H. Clark, with him on the brief), for defendant-appellee.

Before BALDOCK and EBEL, Circuit Judges, and SHADUR, District Judge.*

EBEL, Circuit Judge.

Plaintiff–Appellant Jacqui Starr ("Starr") commenced this defamation and intentional infliction of emotional distress action against Defendant–Appellee Pearle Vision, Inc. ("Pearle Vision"), her former employer. Based on diversity, Pearle Vision removed the action from the Tulsa County District Court to the United States District Court for the Northern District of Oklahoma. 28 U.S.C. §§ 1332, 1441. The district court granted summary judgment in favor of Pearle Vision on all claims and we exercise jurisdiction pursuant to 28 U.S.C. § 1291 to consider Starr's appeal. We reverse the court's dismissal of Starr's claims that Pearle Vision employees defamed her during conversations with two individuals, and affirm in all other respects.

* The Honorable Milton I. Shadur, Senior United States District Judge for the Northern District of Illinois, sitting by designation.

## I. Background

This action arose from Pearle Vision's investigation of a purported $4,000 shortfall in the petty cash account of the Pearle Vision retail optical store that Starr managed in Tulsa, Oklahoma. Initially hired by Pearle Vision in 1988 as an optician, Starr was ultimately promoted to general manager of the Eastland Mall retail store in Tulsa. In that capacity, Starr was responsible for daily operations and staff supervision.

On April 2, 1992, Pearle Vision dispatched three officials to Starr's store to investigate an alleged petty cash shortfall. Jay Bogie, who worked in Pearle Vision's Loss Prevention Division, was joined on this mission by Carla Tredway and Mike Hoglund, Regional Area Managers. During the April 2nd visit, Bogie and Tredway questioned Starr in her small office, situated just behind the retail floor of the Eastland Mall store.[1] Starr contends that Bogie accused her of theft and embezzlement, yelled at her, touched her on the arm, and once pushed her back down in her chair. Although Starr cannot remember the precise duration of the meeting, she stated that it "was not a long period of time." Bogie and Lola Ballard, who worked under Starr's supervision, estimated that the confrontation lasted approximately fifteen minutes.

At one point, Starr briefly interrupted the questioning to exit her office, but she returned shortly thereafter and resumed discussions with Bogie. Starr informed Bogie that she intended to obtain counsel, but nevertheless continued to answer questions. Ultimately, Starr ended the confrontation and exited the store for what proved to be the last time. Not long after departing, Starr telephoned Hoglund at the store to ask whether Pearle Vision had terminated her employment. Hoglund asked Starr to cooperate with Pearle Vision's investigation. When Starr rebuffed Hoglund's request to cooperate, Hoglund fired her. Starr's personnel file states that she was fired for "failing to cooperate with a company investigation."

Bogie and Tredway next questioned Lola Ballard, the lab manager and second-in-command at the store. Bogie informed Ballard of Starr's termination, but the parties dispute the level of specificity with which Bogie explained the surrounding circumstances.

Also on April 2nd, Bogie and Tredway interrogated a third Pearle Vision employee, Glenda Ross, who worked at a neighboring Pearle Vision retail store in Tulsa. According to Ross' deposition, Bogie advised her to confess to credit card fraud because Starr had already been arrested for stealing from the company. Ross explained that Bogie detained her for six hours of questioning and ultimately obtained a handwritten confession that he dictated. Bogie next requested the Tulsa police to arrest Ross and provided the police a copy of an investigative report about the alleged thievery. Starr, however, has never been charged with a crime and has since obtained a position with one of Pearle Vision's competitors in Tulsa.

Subsequent to her termination, Starr spoke with friends and former Pearle Vision colleagues, during which she learned that Pearle Vision employees allegedly defamed her in conversations with Paul Williams, Katherine Winn, and Bob Teagarden.

On May 7, 1992, just a few weeks after the April 2nd incident and her discussions with friends, Starr filed a complaint against Pearle Vision in Oklahoma state court, alleging defamation, intentional infliction of emotional distress, public policy tort, and retaliatory discharge. Pursuant to 28 U.S.C. § 1332, Pearle Vision removed the case to the United States District Court for the Northern District of Oklahoma on May 27, 1992. 28 U.S.C. § 1441.

On February 16, 1993, Pearle Vision filed a summary judgment motion on all claims. While this motion was pending, Starr voluntarily dismissed the public policy tort and retaliatory discharge claims. On May 3, 1993, the district court entered summary judgment in favor of Pearle Vision on the only two remaining claims—defamation and

---

1. Although the parties offer conflicting narratives of what ensued during this questioning, Pearle accepts Starr's version of the facts for the purposes of its summary judgment motion and this appeal. Pearle Br. at 4 n. 1.

intentional infliction of emotional distress. With respect to the defamation claim, the court held that: (1) intracompany communications between Pearle Vision employees did not constitute actionable "publication" under Oklahoma defamation law; (2) Oklahoma does not recognize a cause of action for compelled self-publication of allegedly slanderous statements; and (3) Pearle Vision's statements to non-employees were not defamatory. The court rejected Starr's intentional infliction of emotional distress claim on the grounds that she failed to provide sufficient evidence to show that Pearle Vision's actions were either "extreme" or "outrageous." In this timely appeal, Starr challenges each ruling.

## II. Defamation

■ We review de novo the district court's summary judgment order in favor of Pearle and apply the same legal standard used by the district court. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990). Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). We view the record in a light most favorable to Starr, who opposed the summary judgment motion. *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir.1991). An issue of material fact is genuine if a "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Starr's defamation claim entails three questions: (1) whether intracompany communications constitute actionable "publication" under Oklahoma defamation law; (2) whether Oklahoma recognizes a cause of action for compelled self-publication; and (3) whether Pearle Vision employees made defamatory statements to third parties.

### A. Intracompany Communications

We first address whether Oklahoma defamation law recognizes a claim for slanderous statements uttered between employees of the same company. Starr alleges that Bogie made allegedly slanderous statements to Ross and Ballard.

■ Under Oklahoma law, slander "is a false and unprivileged publication, other than libel, which:

1. Charges any person with crime, or with having been indicted, convicted or punished for crime.

2. Imputes in him the present existence of an infectious, contagious or loathsome disease.

3. Tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade or business that has a natural tendency to lessen its profit.

4. Imputes to him impotence or want of chastity; or,

5. Which, by natural consequences, causes actual damage."

12 Okla.Stat.Ann. § 1442. The first four provisions of § 1442 constitute slander per se, whereas the fifth provision requires a showing of actual damages and thus states a slander per quod rule. *Standifer v. Val Gene Management Servs., Inc.*, 527 P.2d 28, 30–31 (Okla.Ct.App.1974).

In *Magnolia Petroleum Co. v. Davidson*, 148 P.2d 468 (Okla.1944), the Oklahoma Supreme Court held that intracompany communications do not constitute actionable "publications" and dismissed an action for slander brought by a discharged employee against his employer and two of its employees for alleged defamatory statements made to a fellow employee. The court explained that "publication" is the communication of defamatory matter to a third person or persons, and that neither agents nor employees of a company are third persons in relation to the corporation because "they are a part and parcel of the corporation itself." *Id.* at 471.

For a corporation, therefore, acting through one of its agents or representatives, to send a libelous communication to another of its agents or representatives, cannot be a publication or the libel on the part of the corporation. It is but communicating with itself.

*Id.* Sitting in diversity cases applying Oklahoma law, we have relied on *Magnolia Petroleum* to reject defamation claims arising from intracompany communications. *Messina v. Kroblin Transp. Sys., Inc.*, 903 F.2d 1306, 1309 (10th Cir.1990); *M.F. Patterson Dental Supply Co. v. Wadley*, 401 F.2d 167, 171 (10th Cir.1968); *see also Hensley v. Armstrong World Indus., Inc.*, 798 F.Supp. 653, 657 (W.D.Okla.1992).

Starr acknowledges that the Oklahoma Supreme Court has not abandoned *Magnolia Petroleum* over the past fifty years, but argues that its holding is antiquated in light of "modern business reality" in general, and the "highly transient and communicative nature" of the optical work force, in particular. Specifically, she asks us either to disregard *Magnolia Petroleum* or narrow its holding to insulate from liability only intracompany communications made on a "need to know" basis for legitimate business reasons. She maintains that this proposed gloss on *Magnolia Petroleum* would prevent one employee from besmirching a colleague's professional reputation.

■■■ We are unwilling to rewrite Oklahoma law solely on these policy grounds. The threshold conclusion in *Magnolia Petroleum* that intracorporate communications do not constitute "publications" means that liability cannot turn on the content of, or intent behind, the intracorporate communication. Indeed, the court in *Magnolia Petroleum*

eschewed the plaintiff's proposed qualified privilege rule. *Magnolia Petroleum*, 148 P.2d at 471. The court explained that there was no need to define the scope of the privilege because intracorporate communications do not, as matter of law, constitute publications. *Id.*

■■■ Also unpersuasive is Starr's suggestion that Bogie's comments to Ross are not clothed with immunity because Ross was terminated less than 24 hours after Bogie spoke with her. All that *Magnolia Petroleum* requires is that the speaker and listener are employees at the time of the discourse. Starr cannot refute that Bogie's discussion with Ross occurred while Ross was still employed by Pearle Vision.

Age alone cannot drain *Magnolia Petroleum* of its vitality. In fact, that *Magnolia Petroleum* remains unscathed over the past fifty years suggests just the opposite. Because we must adhere to the enduring principles in *Magnolia Petroleum*, we affirm the district court's judgment that intracompany communications do not constitute actionable publication under Oklahoma defamation law.[2]

## B. The Doctrine of Compelled Self-Publication

Starr next contends that she has been, and will continue to be, forced to reveal the accusations surrounding her termination from Pearle when applying for other positions in the retail optical industry and that the accusations are false and injurious. This is the so-called compelled self-publication doctrine, which holds that an individual who only utters the slanderous statement to the victim (and not a third party), may nevertheless be

---

**2.** Because *Magnolia Petroleum* is directly on point, we reject Starr's request to certify the following questions to the Oklahoma Supreme Court:

 (1) Whether the exemption from a defamatory publication stated in *[Magnolia Petroleum]* is conditioned on a showing by declarant that the defamatory intracorporate communication was for a legitimate business purpose necessary to the conduct of the business operations of the corporation?

 (2) Whether under 12 OS § 1442, defamatory accusations of crime by other corporate em-

ployees are entitled to only a conditional privilege which can be abused instead of an absolute privilege for accusations of crime made to any other corporate employees, even employees with no need to know about such accusations?

Pursuant to 20 Okla.Stat.Ann. § 1602, questions may be certified to the Oklahoma Supreme Court only when *"there is no controlling precedent in the decisions of the Supreme Court or Court of Criminal Appeals of this state."* (emphasis added).

held liable if the victim is compelled to repeat the slander to a third person.

No Oklahoma court has considered whether to adopt or reject the self-publication theory. The small number of other jurisdictions that have embraced the self-publication doctrine articulate two formulations, but both tests are anchored on the notion of foreseeability. The first approach imposes liability if the defendant knew or could have foreseen that the plaintiff would be *compelled* to repeat the defamatory statement. *See, e.g., Churchey v. Adolph Coors Co.,* 759 P.2d 1336, 1344 (Colo.1988) (en banc). The second approach imposes liability if the defendant knew or could have foreseen that the plaintiff was *likely* to repeat the defamatory statement. *See, e.g., Neighbors v. Kirksville College of Osteopathic Medicine,* 694 S.W.2d 822, 824–25 (Mo.Ct.App.1985).[3]

In the absence of any Oklahoma authority, federal district courts have concluded that "Oklahoma would not follow the self-publication theory" because "the vast majority of states considering the issue reject it." *Hensley,* 798 F.Supp. at 657; *Tatum v. Philip Morris Inc.,* 809 F.Supp. 1452, 1472 (W.D.Okla.1992) (rejecting a compelled self-publication theory because no Oklahoma authority supports such a cause of action), *aff'd,* 16 F.3d 417, No. 93–6018, 1993 WL 520983 (10th Cir. Dec. 14, 1993) (unpublished), *cert. denied,* — U.S. —, 114 S.Ct. 1833, 128 L.Ed.2d 461 (1994). *See also De Leon v. St. Joseph Hosp., Inc.,* 871 F.2d 1229, 1237 (4th Cir.) (refusing to recognize a claim for compelled self-publication in a diversity case applying Maryland law, because Maryland courts had not adopted the proposition and it "has not gained widespread acceptance"), *cert. denied,* 493 U.S. 825, 110 S.Ct. 87, 107

L.Ed.2d 52 (1989); *Yeitrakis v. Schering–Plough Corp.,* No. 93–2187, 1995 WL 151799, *3–4 (10th Cir. Apr. 6, 1995) (unpublished) (affirming district court's dismissal of claim for compelled self-publication in a diversity case applying New Mexico law, because "there are not clear indications that New Mexico would recognize such a claim" and "only a minority of jurisdictions recognize defamation by self-publication as a cause of action").

■ We agree, and likewise decline to assume that Oklahoma would recognize a claim for compelled self-publication. In any event, here the record does not convince us that Starr was compelled to repeat a slanderous statement to a prospective or new employer. First, Starr presents no evidence of a specific instance in which she was forced to repeat a slanderous statement that a Pearle Vision employee made to her. Moreover, Pearle's stated reason for terminating Starr was that she failed to cooperate with a company investigation, not that she embezzled money from the petty cash account. Thus, Starr would not publish an alleged defamatory statement by informing third parties that she was fired for failing to cooperate with a company investigation because that is a true statement. Absent evidence that Starr was compelled to explain the underlying accusations that prompted the investigation, we cannot conclude that she was forced to repeat a slanderous statement.

Thus, we affirm the court's summary judgment order in favor of Pearle Vision on Starr's compelled self-publication claim.[4]

**C. Publication to Third Parties**

In her third defamation claim, Starr alleges that Pearle Vision employees made slan-

---

**3.** The Restatement (Second) of Torts recognizes the self-publication doctrine, but only when the plaintiff repeats the defamatory statement "without an awareness of the defamatory nature of the matter." Restatement (Second) of Torts § 577, comment m (1977).

One who communicates defamatory matter directly to the defamed person, who himself communicates it to a third person, has *not* published the matter to the third person if there are no other circumstances. *If the defamed person's transmission of the communication to the third person was made, however, without an awareness of the defamatory nature*

*of the matter and if the circumstances indicated that communication to a third party would be likely, a publication may properly be held to have occurred.*
*Id.* (emphasis added).

**4.** Accordingly, we reject Starr's request to certify the following question to the Oklahoma Supreme Court: "Whether self-publication of a former employer's slander is actionable because nowadays all job applicants must account to prospective employers for why they recently left a long-term job?"

derous statements to Bob Teagarden ("Teagarden"), Paul Williams ("Williams"), and Katherine Winn ("Winn"), none of whom were employed by Pearle Vision at the time the statements were made. We address these claims in turn.

### (1) Teagarden

Starr first alleges that Pearle Vision's new manager defamed Starr while interviewing Teagarden, a non-employee, for a job at Pearle Vision. The only evidence of this conversation, however, is the testimony of John Priest, Starr's new boss at Optical Warehouse. According to Priest, Teagarden told him that the new Eastland Mall store manager said that Starr "was fired because she was embezzling a whole bunch or something to that effect." Aplt.App. at 170. Starr deposed neither the new manager nor Teagarden.

Priest's testimony constitutes hearsay because Starr offers it for the truth of Teagarden's statement that the new manager actually made the comment about Starr. Fed. R.Evid. 801(c). Of course, Teagarden could testify to the new manager's statement without running afoul of the prohibition against hearsay because the statement would not be offered for its truth, but instead for the mere fact that it was said. Instead, Starr offers Priest's testimony for the truth of what Teagarden said to Priest (i.e. that the new manager defamed Starr during a discussion with Teagarden).

Thus, we must determine whether Fed. R.Civ.P. 56(e) permits a nonmoving party to rely on inadmissible hearsay statements contained in depositions to overcome summary judgment. Rule 56(e) states that "[s]upporting and opposing affidavits ... shall set forth such facts as would be admissible in evidence," but is silent about the permissible contents of depositions. Under the familiar maxim *expressio unius est exclusio alterius,* Starr argues that, given Rule 56's express bar against hearsay in affidavits, the absence of a similar bar with respect to depositions constitutes an implicit permission of its use in depositions.

Although we have not addressed this question before today, the unanimous weight of authority is to the contrary. Other circuits have held that a court may not consider hearsay evidence in depositions submitted to defeat summary judgment and the Supreme Court impliedly adheres to this rule. *Cormier v. Pennzoil Exploration & Prod. Co.,* 969 F.2d 1559, 1561 (5th Cir.1992); *Skillsky v. Lucky Stores, Inc.,* 893 F.2d 1088, 1091 (9th Cir.1990); *Randle v. LaSalle Telecommunications, Inc.,* 876 F.2d 563, 570 n. 4 (7th Cir.1989); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159 n. 19, 90 S.Ct. 1598, 1609 n. 19, 26 L.Ed.2d 142 (1970). The leading commentators endorse this rule as well. 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure: Civil 2d § 2722 at 48–49 ("Only that portion of a deposition that would be admissible in evidence at trial may be introduced on a summary judgment motion...."); 6 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice, ¶¶ 56.11[1.–3], 56.11[4] (2d ed. 1988) (Depositions "may be considered by the district court in determining a Rule 56 motion to the extent that they are admissible in evidence—i.e., the testimony is competent, relevant and material.").

 Today, we align ourselves with this line of authority and hold that Rule 56 precludes the use of inadmissible hearsay testimony in depositions submitted in support of, or in opposition to, summary judgment. We see no principled reason to permit hearsay in depositions, but bar its inclusion in affidavits. Because the district court correctly refused to accord any weight to the hearsay in Priest's deposition as to what the new Pearle manager said to Teagarden about Starr, we affirm the court's dismissal of Starr's claim that a Pearle employee defamed her in a conversation with Teagarden.

### (2) Williams

 Williams, a friend of Starr and a former Pearle Vision employee, testified that he attempted to telephone Starr at the Eastland Mall Pearle Vision store. Williams explained that he instead spoke with Ballard, who informed him that Starr had been terminated due to accusations that she stole money from Pearle Vision. Contrary to Pearle

Vision's protestations, William's testimony about her conversation with Ballard does not constitute hearsay because Ballard's statement is not offered for the truth of the matter, but instead for the mere fact that Ballard uttered that statement. Fed.R.Evid. 801(c) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted").

█ Principles of respondeat superior dictate that Pearle Vision may be held liable for the tortious acts of its employees "so long as [the] harm is inflicted while the agent or servant is on duty, on the job, or fulfilling an employment-related mission; and the complained of act is incident to or activated by such service to the master or principal." *Dill v. Rader,* 533 P.2d 650, 656 (Okla.Ct. App.1975). Pursuant to 12 Okla.Stat.Ann. §§ 1442(1) & (3), Ballard's alleged statement could be considered slander per se because it charges Starr with the commission of a crime. *See Dill,* 533 P.2d at 652; *Standifer,* 527 P.2d at 30–31. And, inasmuch as Pearle Vision states that Starr was fired for failing to cooperate with a company investigation, Ballard's alleged statement also satisfies the element of falsity at the summary judgment stage of these proceedings.

Pearle Vision argues in response that Ballard's publication to Williams cannot be attributed to Pearle Vision because the source of Ballard's knowledge about Starr's termination was Starr herself, not Bogie or any other Pearle Vision employee. In Ballard's affidavit, she claims that Bogie never informed her of the details behind Starr's termination, and that it was Starr herself who told her of Bogie's alleged accusations. Aplee's Supp.Br. at 76–77. Starr argues that there is evidence in the record to counter Ballard's assertion, creating a genuine dispute of fact over the precise source of Ballard's knowledge that is sufficient to overcome summary judgment. In Starr's response to Pearle Vision's interrogatories, Starr documents a phone conversation in which Ballard allegedly told Starr that "Jay [Bogie] said, 'We've been watching Jacqui [Starr]. She's been committing credit card

fraud and she won't be working here any more.'" Aplt's App. at 99.

Pearle Vision argues that this information in Starr's answer to interrogatories must be disregarded for purposes of summary judgment because it is hearsay that would be inadmissible at trial. Aplee's Br. at 14. For the same reasons discussed above with respect to depositions, we agree with Pearle Vision's supposition that Rule 56 precludes the use of inadmissible hearsay testimony in answers to interrogatories at the summary judgment stage. *See H.B. Zachry Co. v. O'Brien,* 378 F.2d 423, 425–26 (10th Cir.1967) ("Although answers to interrogatories under Rule 33 are permissible in support of the defendant's motion [for summary judgment], they are subject to the same infirmities as an affidavit would be under 56(e)."); *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 49–50 (1st Cir.1990) (holding that in summary judgment proceedings, answers to interrogatories "may be given effect so far as they are admissible under the rules of evidence"); 10A Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2722 at 51–52 (explaining that Rule 56 was amended in 1963 to "expressly provid[e] for the use of answers to interrogatories on a summary judgment motion as long as they ... contain admissible material"); Moore's Federal Practice, ¶ 56.11[1.–4] (same). However, we disagree with Pearle Vision's conclusion that the portion of the interrogatory answer at issue here would be inadmissible at trial.

█ Starr's answer documents a telephone conversation in which Ballard allegedly said that Bogie told her that Starr committed credit card fraud. Bogie's alleged statement to Ballard is not hearsay because it is not offered for the truth of the matter asserted—that Ballard committed credit card fraud—but instead for the mere fact that the statement was uttered. Fed.R.Evid. 801(c). Although Ballard's alleged statement to Starr is being offered for its truth—that Bogie told her that Starr committed fraud— it appears from the record before us that it may be considered an admission by a party opponent which is deemed nonhearsay under Fed.R.Evid. 801(d)(2)(D). That rule provides that "a statement by the party's agent or

servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship," may be offered against that party at trial. We do not attempt to decide on appeal whether the asserted statements by Ballard to Starr concerned a matter within the scope of Ballard's employment. That is a matter that the district court will have to address on remand.

■ However, because the statement in Starr's interrogatory answer may be admissible, and if so, it would create a dispute of fact over the source of the defamatory statement that Ballard allegedly publicized to Williams, and thus over Pearle Vision's liability for that publication, we must reject Pearle's plea for summary judgment on this ground. Our task at summary judgment is not to assess the credibility of this conflicting testimony. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513 ("Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."); *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 533 (10th Cir.1994) (same).

■ Without addressing this factual dispute, the district court concluded that Starr failed to show actual harm to her reputation. However, because slander per se does not require proof of actual damages, 12 Okla. Stat.Ann. § 1442(1)–(4), *see Standifer*, 527 P.2d at 30–31; *Dill*, 533 P.2d at 652, and a genuine issue of material fact exists as to whether Ballard defamed Starr during a conversation with Williams, we reverse the court's summary judgment dismissal of the claim arising from Williams' testimony.[5]

**(3) Winn**

Like Williams, Winn also was not a Pearle Vision employee when she unsuccessfully attempted to contact Starr at the Eastland Mall Pearle Vision store in early April 1992. According to Winn's testimony, the man who answered her telephone call to the store identified himself as the new store manager and stated that Starr no longer worked there. In Winn's words, the following colloquy ensued:

> After he said, "She is no longer here," I was shocked. I said, "As of when?" He said, "As of yesterday," and I said, "What do you mean? What happened?" And he said, "She is in big trouble. And she does not—She no longer works here." I said, "Who are you?" He said, "I'm the new manager." I said, "Did she quit, or was she fired? What has happened?" He said, "She's in big trouble. I'll just put it that way."

Aplt.App. at 230. Winn acknowledged that this new manager never explicitly said that Starr had embezzled, or was accused of embezzling, money from the store. *Id.* at 230–31.

■ The district court concluded that the new manager's statement was not defamatory because it was true that Starr was no longer working at the Pearle store and the expression "she's in big trouble" did not actually lower Winn's opinion of Starr. However, we must evaluate the statement "she's in big trouble" in the context of the new manager informing Winn that Starr no longer worked at the Eastland Mall. Whether this comment imputes the commission of a crime or tends to injure the victim's professional reputation—and therefore constitutes slander per se under 12 Okla.Stat.Ann. §§ 1442(1) or (3)—is a question for the factfinder. As noted above, a claim of slander per se renders irrelevant the absence of evidence that a comment actually sullied the victim's reputation. *See Standifer*, 527 P.2d at 30–31; *see also Dill*, 533 P.2d at 652. Thus, we conclude that the court erred in dismissing the claim arising from the new manager's conversation with Winn.

To summarize our conclusions on Starr's defamation theories, we affirm the district court's rulings that: (1) intracompany communications do not constitute actionable pub-

---

5. Accordingly, we reject Starr's request to certify the following question to the Oklahoma Supreme Court: "Whether under 12 OS § 1442, the recipient of the defamatory statement has to believe the defamation in order for the defamed plaintiff to establish a claim for relief, so long as there is evidence of actual harm to the plaintiff notwithstanding the disbelief?"

lication; (2) Oklahoma does not recognize a cause of action for compelled self-publication; and (3) Starr offers no admissible evidence to support her claim that the Eastland Mall store manager defamed her during a conversation with Teagarden. However, we reverse the court's summary judgment order in favor of Pearle Vision on Starr's claims that Pearle Vision employees uttered defamatory statements to Williams and Winn, and remand for further proceedings consistent with this opinion.

## III. Intentional Infliction of Emotional Distress

We now turn to Starr's intentional infliction of emotional distress claim, arising from Bogie's confrontation with Starr on April 2, 1992 in the Eastland Mall store. Starr alleges that Bogie "committed assault and battery ... when he threatened her physical safety, pushed her around and physically blocked her exit from his interrogation room." Starr Br. at 26.[6] As noted above, we review de novo the court's summary judgment ruling on this claim. *Applied Genetics*, 912 F.2d at 1241.

 Oklahoma recognizes intentional infliction of emotional distress as an independent tort. *Eddy v. Brown*, 715 P.2d 74, 76 (Okla.1986). Also known as the tort of outrage, an intentional infliction of emotional distress claim under Oklahoma law is governed by the standards in Restatement (Second) of Torts § 46:

> "One who by extreme or outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."

*Id.* (quoting Restatement (Second) of Torts § 46). In a recent case applying Oklahoma law, we identified four elements to an intentional infliction of emotional distress claim: (1) the tortfeasor acted intentionally or recklessly; (2) the tortfeasor's conduct was extreme and outrageous; (3) the plaintiff actually experienced emotional distress; and (4)

the emotional distress was severe. *Daemi v. Church's Fried Chicken, Inc.*, 931 F.2d 1379, 1387 (10th Cir.1991).

The Oklahoma Supreme Court has explained that liability for this tort does not extend to " 'mere insults, indignities, threats, ... [or] occasional acts that are definitely inconsiderate and unkind.' " *Eddy*, 715 P.2d at 77 (quoting Restatement (Second) of Torts § 46, comment d); *see* Restatement (Second) of Torts § 46, comment j (describing as actionable only conduct that is of such character that "no reasonable person could be expected to endure it"). Instead, the defendant's conduct must be "beyond all possible bounds of decency" or "utterly intolerable in a civilized community." *Eddy*, 715 P.2d at 77. Nothing short of "*[e]xtraordinary* transgressions of the bounds of civility" will give rise to liability for intentional infliction of emotional distress. *Merrick v. Northern Natural Gas Co.*, 911 F.2d 426, 432 (10th Cir.1990) (applying Oklahoma law and rejecting claim for intentional infliction of emotional distress).

 Moreover, our evaluation of whether Bogie's conduct was "extreme and outrageous" must consider the setting in which the conduct occurred. *Eddy*, 715 P.2d at 77. To that end, "Oklahoma courts have allowed employers some latitude in investigating possible employee misconduct." *Daemi*, 931 F.2d at 1388 n. 8. In *Merrick*, for example, we held that an employee's supervisor did not engage in "extreme and outrageous" conduct by "harshly criticizing him, yelling at him, cursing at him on one occasion, and by allowing another employee to switch offices with [him] while [he] was not in the office." *Merrick*, 911 F.2d at 433. "Insubordination, yelling, hostile reactions and the hurt feelings naturally accompanying such conduct do not give rise to a cause for intentional infliction of emotional distress." *Id.* Likewise, in *Daemi*, we upheld a district court's rejection of the plaintiff's claim that his employer inflicted severe emotional distress by "impugning his integrity by accusing him of criminal acts, ... requiring him to take a polygraph ... [and] subjecting him to ridicule and other

---

**6.** To buttress her claim, Starr offered expert witness testimony diagnosing her as suffering from

post-traumatic stress disorder. Aplt.App. at 153–54, 158–59.

abusive treatment at [company] seminars." *Daemi,* 931 F.2d at 1388.[7]

■ In contrast, the Oklahoma Court of Appeals recently upheld a jury verdict in favor of the personal representative of a television news anchor's estate for the defendants' alleged intentional infliction of emotional distress in terminating the co-anchor based on unsubstantiated reports of homosexual activity. The defendants refused to disclose the source of their information or to investigate its accuracy. Instead, motivated by malice, the defendants relied on allegations of homosexual activity, that were not credible, all of which led the news anchor to take his own life. *Joffe v. Vaughn,* 873 P.2d 299, 303 (Okla.Ct.App.1993). The court explained that a trial court properly submitted that claim to a jury after determining that the defendants' conduct " 'may reasonably be regarded as so extreme and outrageous as to permit recovery.' " *Id.* at n. 6 (quoting *Breeden v. League Servs. Corp.,* 575 P.2d 1374, 1377 (Okla.1978)). Whether the conduct rises to the "extreme or outrageous" level is, of course, an objective rather than a subjective inquiry. *Daemi,* 931 F.2d at 1388.

■ The district court in the instant case held that Bogie's conduct was neither extreme nor outrageous. Order of May 3, 1993 at 7. Starr alleges that Bogie committed assault and battery during the April 2nd meeting, and proclaims that any assault or battery triggers liability for intentional infliction of emotional distress. Absent Oklahoma authority espousing a per se correlation between any assault or battery and the tort of intentional infliction of emotional distress, we cannot accept that every assault or battery is necessarily an intentional infliction of emotional distress.

■ Instead, we focus on the totality of the circumstances, including the nature of the conduct and setting in which it occurred. According to the record, Starr acknowledged that the meeting with Bogie and Tredway in her office on April 2nd did not last long and that Starr felt free to interrupt the confrontation twice, once to exit her office briefly to speak with Hoglund and the second time to end the meeting and exit the store. Bogie's alleged pointed and stentorian questions, posed as they were in the context of an employer's investigation of embezzlement, do not cross the bounds between what is merely rude and objectionable and what is actionable. We are troubled by Bogie's alleged physical conduct because the use of physical force to induce a confession or to intimidate could reasonably be regarded as extreme or outrageous. Yet, when we look beyond the label that Starr attaches to Bogie's physical conduct, and focus on the precise facts that she alleges, we conclude that Bogie's purported conduct did not rise to the "extreme" or "outrageous" level.[8]

For the foregoing reasons, we affirm the court's summary judgment order regarding Starr's intentional infliction of emotional distress claim.

## IV. Conclusion

We AFFIRM the district court's grant of summary judgment for Pearle Vision on Starr's intentional infliction of emotional distress claim. We AFFIRM the district court's grant of summary judgment for

---

7. Starr ignores the facts and holdings in *Daemi* and *Merrick,* opting instead to rely solely on *Snider v. Circle K Corp.,* 923 F.2d 1404, 1408–09 (10th Cir.1991). When viewed in the context of its procedural posture, however, *Snider* does not dictate judgment in favor of Starr. In *Snider,* the district court submitted the plaintiff's intentional infliction of emotional distress claim to the jury, which ruled in her favor. Defendants appealed, following an adverse jury verdict, claiming there was insufficient evidence at trial to have submitted that issue to the jury. We reviewed that ruling under an abuse of discretion standard. The evidence there revealed a sustained, persistent and orchestrated campaign to embarrass and humiliate the plaintiff which is quite unlike the episodic nature of the events involving Jacqui Starr.

8. Starr's deposition provides in pertinent part:

Q: Did he [Bogie] ever raise his hand at you?
A: He did touch me.
Q: And where did he touch you?
A: I recall being touched on the arm. I recall being touched on the leg. I recall him putting his body in front of mine so I couldn't move.
Q: Did he touch you when he put his body in front of yours?
A: I don't know.

Starr App. at 132.

Pearle Vision on Starr's defamation claim, except to the extent that Starr alleges defamation by Pearle Vision employees to non-employees Williams and Winn. With respect to those particular defamation claims, we REVERSE summary judgment and REMAND for further proceedings consistent with this opinion. Thus, we AFFIRM in part, and REVERSE and REMAND in part.